## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **TERRY MORTENSON,** | : | **CIVIL ACTION NO. 3:13-CV-02136** |
| | : | |
| **Plaintiff** | : | **(Chief Judge Conner)** |
| | : | |
| **vs.** | : | |
| | : | |
| **CAROLYN W. COLVIN, ACTING** | : | |
| **COMMISSIONER OF SOCIAL** | : | |
| **SOCIAL SECURITY,** | : | |
| | : | |
| **Defendant** | : | |

## MEMORANDUM

## Background

The above-captioned action seeks review of a decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Terry Mortenson's claim for social security disability insurance benefits and supplemental security income benefits.  Under 42 U.S.C. § 405(g) and relevant case law, the court is generally limited to reviewing the administrative record to determine whether the decision is supported by substantial evidence.

Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes.  The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured."  It is undisputed that Mortenson met the insured status requirements of the Social Security Act through

September 30, 2010.  Tr. 15-16, 91, 93, 176 and 202.[1]  In order to establish

entitlement to disability insurance benefits Mortenson was required to establish

that he suffered from a disability on or before September 30, 2010.  42 U.S.C.

§423(a)(1)(A), (c)(1)(B); 20 C.F.R. §404.131(a)(2008); see Matullo v. Bowen, 926 F.2d

240, 244 (3d Cir. 1990).

Supplemental security income is a federal income supplement program

funded by general tax revenues (not social security taxes).  It is designed to help

aged, blind or other disabled individuals who have little or no income.  Insured

status is irrelevant in determining a claimant's eligibility for supplemental security

income benefits.

On June 29, 2010, Mortenson protectively filed[2] an application for disability

insurance benefits and an application for supplemental security income benefits.

Tr. 14, 35, 37, 83-91, 93 and 176.  On October 29, 2010, the Bureau of Disability

Determination[3] denied Mortenson's applications. Tr. 38-45.  On November 12, 2010,

Mortenson filed a request for a hearing before an administrative law judge. Tr.  14

---

[1]References to "Tr._" are to pages of the administrative record filed by the
Defendant as part of the Answer on November 19, 2013.

[2]A protective filing occurs when an individual initially contacts the Social
Security Administration to file a claim for benefits and requests an expedited filing
date. Simply stated, it allows an individual to have an application date based upon
the date of his or her first contact with the Administration.

[3]The Bureau of Disability Determination is an agency of the state which
initially evaluates applications for disability insurance benefits and supplemental
security income benefits on behalf of the Social Security Administration.  Tr. 38 and
42.

and 48-49.  The request was granted and a hearing was held on September 27, 2011.

Tr. 14 and 27-34.  Mortenson did not appear at the hearing and was not represented

by an attorney at the hearing but by a non-attorney representative.  Id.

Mortenson in his applications for disability insurance benefits and

supplemental security income benefits alleged that he became disabled on May 14,

2010. Tr. 14, 83, 87 and 175.  Mortenson contends that he is unable to work because

of left lower extremity deep venous thrombosis,[4] obesity, mild mental retardation,

and headaches. Doc. 16, Plaintiff's Brief, p. 2-3.  He also claims that he suffers from

depression and anxiety. Tr. 204.

Mortenson stated in documents filed with the Social Security Administration

that he lives with his girlfriend; he has a "a lot of pain going down [his] leg;" he

need reminders to take his medications; he fixes simple meals such as sandwiches

and frozen dinners; he does laundry, mowing and cleaning house once a week; he

shops in stores once a month; he no longer engages in his hobbies of "shooting pool,

swimming and hanging out with friends" because of his disability; "at times" he

needs someone to accompany him when he goes out; he has problems handling

stress and changes in routine; and he worries all the time. Tr. 182-189.  The non-

---

[4] "Deep venous thrombosis is a blood clot that forms in a vein deep inside a
part of the body. It mainly affects the large veins in the lower leg and thigh." Deep
venous thrombosis,  MedlinePlus, A service of the U.S. National Library of
Medicine, http://www.nlm.nih.gov/medlineplus/ency/article/000156.htm (Last
accessed September 3, 2014).

attorney representative when asked by the administrative law judge if she had an

opening statement responded as follows:

> [I]t's kind of hard with him not here, not being able to talk to him.  I know he
> has the deep vein thrombosis.  I haven't got an update as to how it's doing.
> But by the record, he did have headaches . . . dizziness.  He was doing a
> heavy job of stone quarry work in which he was – it was very heavy work.  He
> had a limited education.  And we just believe, because of the clot in his leg,
> he'd only be able to do sedentary work.  However, these jobs would  – would
> be hard for him, also, because he did tell me that his leg swells if he sits and
> stands for long periods of time[]; and that he gets frequent headaches,
> needs frequent breaks.

Tr. 32.

On January 9, 2012,  the administrative law judge issued a decision denying

Mortenson's applications. Tr. 14-26.  The administrative law judge found that

Mortenson failed to prove that he met the requirements of a listed impairment or

suffered from work-preclusive functional limitations. Id.  The administrative law

judge concluded that Mortenson had the ability to engage in the full-range of

unskilled, sedentary work.[5] Id.  The administrative law judge in setting Mortenson's

---

[5]The terms sedentary, light, medium, heavy and very heavy work are defined
in the regulations of the Social Security Administration as follows:

> (a) *Sedentary work*. Sedentary work involves lifting no more than 10
> pounds at a time and occasionally lifting or carrying articles like
> docket files, ledgers, and small tools.  Although a sedentary job is
> defined as one which involves sitting, a certain amount of walking and
> standing is often necessary in carrying out job duties.  Jobs are
> sedentary if walking and standing are required occasionally and other
> sedentary criteria are met.

> (b) *Light work*.  Light work involves lifting no more than 20 pounds at a
> time with frequent lifting or carrying of objects weighing up to 10
> pounds.  Even though the weight lifted may be very little, a job is in

4

residual functional capacity at the full-range of unskilled, sedentary work found

that Mortenson's claims set forth in various documents regarding his functional

limitations were not credible and were not supported by the objective medical

evidence. Tr. 20.

The administrative law judge did not rely on the testimony of a vocational

expert or identify specific jobs which Mortenson could perform on a full-time basis.

Tr, 22-23.  Instead, the administrative law judge utilized the Medical-Vocational

Guidelines set forth at 20 C.F.R. pt. 404, subpt. P, app. 2.

---

this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as  loss of fine dexterity or inability to sit for long periods of time.

(c) *Medium work*.  Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.  If someone can do medium work, we determine that he or she can do sedentary and light work.

(d) *Heavy work*.  Heavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If someone can do heavy work, we determine that he or she can also do medium, light, and sedentary work.

(e) *Very heavy work*.  Very heavy work involves lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more.  If someone can do very heavy work, we determine that he or she can also do heavy, medium, light and sedentary work.

2 C.F.R. §§ 404.1567 and 416.967.

Contained within the Social Security regulations is a grid or table which lists Rules 201.01 through 203.31 in the left hand column.  The Social Security regulations provide that "where the findings of fact made with respect to a particular individual's vocational factors and residual functional capacity coincide with all of the criteria of a particular rule, the rule directs a conclusion as to whether the individual is or is not disabled." Rule 200.00. The Medical-Vocational Guidelines only cover sedentary, light and medium work.  To utilize the Medical-Vocational Guidelines a claimant must be able to perform the full-range of a given level of work activity, i.e., sedentary, light or medium.  If a claimant has any non-exertional limitations the Medical-Vocational Guidelines cannot be utilized to deny benefits.[6] Jesurum v. Secretary of U.S. Dept. of Health & Human Services, 48 F.3d 114, 120 (3d Cir. 1995)(sit/stand option a nonexertional limitation); Scott v. Shalala, 30 F.3d 33, 35 (5th Cir. 1994)(same).

In the right hand column of the grid or table is set forth the "Decision" as to whether a claimant is "disabled" or "not disabled."   If all of the criteria of

---

[6]Exertional demands are the strength demands of an occupation, i.e., sitting, standing, walking, lifting, carrying, pushing or pulling. 20 C.F.R. § 404.1569a(b). Nonexertional demands are demands of a job other than the strength demands. Id. If a medical or psychiatric condition impacts an individuals ability to meet the demands of a job other than the strength demands, the individual is considered to have only nonexertional limitations or restrictions. Id. Examples of those nonexertional limitations are difficulty functioning because of nervousness, anxiety or depression; difficulty maintaining attention or concentration; difficulty understanding or remembering instructions; difficulty hearing or seeing; difficulty tolerating exposure to certain environments; and difficulty engaging in manipulative or postural activities such as reaching, stooping or fingering. Id.

particular Rule are met "[t]he existence of jobs in the national economy is reflected in the 'Decisions' shown in the rules, i.e., in promulgating the rules, administrative notice has been taken of the numbers (sic) of unskilled jobs that exist throughout the national economy at the various functional levels. . . Thus, when all factors coincide with the criteria of a rule, the existence of such jobs is established." Rule 200.00(b).

The administrative law judge concluded that based on his residual functional capacity, age, his education and his past work, Mortenson was not disabled because he could perform a significant number of unskilled, sedentary jobs in the national economy pursuant to Rule 201.24 of the Medical-Vocational Guidelines (grid). If all the criteria of Rule 201.24 are met then an individual is not disabled and there is no need to proceed to step five of the sequential evaluation process and determine based upon a vocational expert's testimony that there are other jobs in the economy which the claimant's can perform. In this case the administrative law judge made findings of fact which corresponded with all of the criteria of Rule 201.24 and found that Mortenson was not disabled.[7]

---

[7]Not all sedentary positions provide for a sit or stand option. In fact the Dictionary of Occupational Titles does not provide for it. Instead, vocational experts frequently testify based on their experience regarding whether or not such an option would be available for a particular position. The administrative law judge in his decision did not address the issue of whether or not Mortenson needed a sit or stand option at will which would have prohibited him from performing the full-range of sedentary work.

On February 6, 2012, Mortenson filed a request for review with the Appeals Council. Tr. 9-12. On June 12, 2013, the Appeals Council concluded that there was no basis upon which to grant Mortenson's request for review. Tr. 1-4. Mortenson filed the instant complaint in this court on August 12, 2013.

Mortenson was born in the United States on October 4, 1973, and at all times relevant to this matter was considered a "younger individual"[8] whose age would not significantly impact his ability to adjust to other work. 20 C.F.R. §§ 404.1563(c) and 416.963(c); Tr. 103, 107 and 125.

Mortenson has a 10th grade education and during his elementary and secondary schooling he attended special education classes. Tr. 112-157 and 210. School records reveal that at the age of 12, Mortenson was reading at the second grade level. Tr. 112. At the age of 16, he was reading at the third grade level. Tr. 114. Intelligence testing performed when Mortenson was 8½ years old showed that he was "in the Mild Range of Mental Deficiency." Tr. 155. After withdrawing from high school Mortenson did not complete "any type of specialized job training, trade or vocational school." Tr. 160. When Mortenson was interviewed by B. Eggleston, an employee of the Social Security Administration, after Mortenson applied for disability benefits, Eggleston observed that Mortenson "was a very poor historian and had difficulty understanding [] questions on many occasions." Tr. 177.

---

[8]The Social Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49." 20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1). Mortenson was 37 years of age at the time of the administrative hearing. Tr. 33.

Mortenson stated in documents filed with the Social Security Administration that he is able to converse in English and perform basic mathematical functions. Tr. 158 and 185.

Mortenson's work history covers 17 years and at least 13 different employers. Tr. 94 and 99-104.  The records of the Social Security Administration reveal that Mortenson had earnings in the years 1990 through 2003 and 2005 through 2007. Tr. 94.  Mortenson's annual earnings range from a low of $302.51 in 1992 to a high of $14,946.75 in 2000. Id.  The sum of Mortenson's earnings during those 17 years is $107,099.39. Id.  A vocational expert, as stated above, did not testify at the administrative hearing and, consequently, did not identify Mortenson's past relevant employment.[9]  The administrative law judge, however, based on a review of the records and documents filed by Mortenson found that all of Mortenson's past work was "clearly at exertional levels beyond sedentary work" and that he was "unable to perform any past relevant work." Tr. 22.

Mortenson has had employment as a clerk at a gas station, as a tree cutter, as a construction worker/laborer, as a window glass repairer, and as a painter. Tr. 165 and 194.  Mortenson stated in documents filed with the Social Security Administration that he last worked in May, 2010,  at a stone quarry lifting and

---

[9]Past relevant employment in the present case means work performed by Mortenson during the 15 years prior to the date his claim for disability was adjudicated by the Commissioner.  20 C.F.R. §§ 404.1560 and 404.1565. To be considered past relevant work, the work must also amount to substantial gainful activity. Pursuant to Federal Regulations a person's earnings have to rise to a certain level to be considered substantial gainful activity.

stacking stone. Tr. 160, 165 and 194.  Mortenson reported that he stopped working because of his medical condition and he is unable to keep a job because of a learning disability and blood clots in his left leg accompanied by pain. Tr. 9, 159 and 191.  He has not engaged in any substantial gainful activity since May 14, 2010.  Tr. 16.

## I.   <u>Standard of Review</u>

When considering a social security appeal, we have plenary review of all legal issues decided by the Commissioner.  <u>See</u> <u>Poulos v. Commissioner of Social Security</u>, 474 F.3d 88, 91 (3d Cir. 2007); <u>Schaudeck v. Commissioner of Social Sec. Admin.,</u> 181 F.3d 429, 431 (3d Cir. 1999); <u>Krysztoforski v. Chater</u>, 55 F.3d 857, 858 (3d Cir. 1995).  However, our review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence." <u>Id.</u>; <u>Brown v. Bowen</u>, 845 F.2d 1211, 1213 (3d Cir. 1988); <u>Mason v. Shalala</u>, 994 F.2d 1058, 1064 (3d Cir. 1993).  Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); <u>Fargnoli v. Massanari</u>, 247 F.3d 34, 38 (3d Cir. 2001)("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); <u>Cotter v. Harris</u>, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence.").

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988)(quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. Brown, 845 F.2d at 1213.  In an adequately developed factual record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971).  A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence.  Mason, 994 F.2d at 1064.  The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-707.  Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole.  Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

## II.    **Sequential Evaluation Process**

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A). Furthermore,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in evaluating disability insurance and supplemental security income claims. See 20 C.F.R. §§ 404.1520 and 416.920; Poulos, 474 F.3d at 91-92. This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity,[10] (2) has an impairment that is severe or a combination of impairments that

---

[10]If the claimant is engaging in substantial gainful activity, the claimant is not disabled and the sequential evaluation proceeds no further. Substantial gainful activity is work that "involves doing significant and productive physical or mental duties" and "is done (or intended) for pay or profit." 20 C.F.R. §§ 404.1510 and 416.910.

is severe,[11] (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment,[12] (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id.  As part of step four the administrative law judge must determine the claimant's residual functional capacity. Id.[13]

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and

---

[11]The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. §§ 404.1520(c) and 416.920(c). If a claimant has no impairment or combination of impairments which significantly limits the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two.  Id.  If a claimant has any severe impairments, the evaluation process continues. 20 C.F.R. §§ 404.1520(d)-(g) and 416.920(d)-(g). Furthermore, all medically determinable impairments, severe and non-severe, are considered in the subsequent steps of the sequential evaluation process. 20 C.F.R. §§ 404.1523, 404.1545(a)(2), 416.923 and 416.945(a)(2).  An impairment significantly limits a claimant's physical or mental abilities when its effect on the claimant's performance of basic work activities is more than slight or minimal. Basic work activities include the ability to walk, stand, sit, lift, carry, push, pull, reach, climb, crawl, and handle. 20 C.F.R. §§ 404.1545(b) and 416.945(b).  An individual's basic mental or non-exertional abilities include the ability to understand, carry out and remember simple instructions, and respond appropriately to supervision, coworkers and work pressures. 20 C.F.R. §§ 404.1545(c) and 416.945(c).

[12]If the claimant has an impairment or combination of impairments that meets or equals a listed impairment, the claimant is disabled. If the claimant does not have an impairment or combination of impairments that meets or equals a listed impairment, the sequential evaluation process proceeds to the next step.

[13]If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

continuing basis.  See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2,

1996).  A regular and continuing basis contemplates full-time employment and is

defined as eight hours a day, five days per week or other similar schedule.  The

residual functional capacity assessment must include a discussion of the

individual's abilities. Id; 20 C.F.R. §§ 404.1545 and 416.945; Hartranft, 181 F.3d at

359 n.1 ("'Residual functional capacity' is defined as that which an individual is still

able to do despite the limitations caused by his or her impairment(s).").

## III.   **Medical Records**

Before we address the administrative law judge's decision and the arguments

of counsel, the court will review all relevant aspects of Mortenson's medical records.

On May 20, 2010, Mortenson had an appointment with his primary care

physician  Arindam Purkayastha, M.D., at Barnes-Kasson Hospital & Family

Health Clinic. Tr. 257.  At that appointment Mortenson complained of neck pain

and pain radiating into the right side of one of his arms.[14] Id.  The objective physical

examination findings reported were normal other than slightly elevated blood

pressure. Id.  The clinical impression was that Mortenson was suffering from an

anxiety reaction and borderline high blood pressure. Id.

On or about May 28, 2010, Mortenson complained of left lower leg pain and

an x-ray was ordered which revealed "[n]o bony injury or lesions." Tr. 259.

---

[14]The record does not identify which arm.

14

From June 3 to 8, 2010, Mortenson was hospitalized at the Community Medical Center in Scranton for acute deep venous thrombosis of the left calf. Tr. 221-229.  Mortenson was treated with the anticoagulant medications Lovenox and Coumadin. Id.  At the time of discharge he was instructed to follow-up with his primary care physician and given a prescription for Lovenox and Coumadin. Id.

At an appointment with Dr. Purkayastha on June 14, 2010, it was observed that the swelling of Mortenson's left leg had "considerably subsided." Tr. 256. Mortenson was advised to continue taking Lovenox and Coumadin. Id.  On July 6, 2010, Dr. Purkayastha observed some residual swelling of Mortenson's left lower leg and Mortenson reported some discomfort. Tr. 255.  Mortenson also reported "episodes of palpitations" and Dr. Purkayastha noted that Mortenson was "very nervous about the same." Id.  Dr. Purkayastha opined that Mortenson "probably had some tachycardia"[15] and he "reassured" Mortenson and "advised him to continue to take his present medications." Id.

At an appointment on July 22, 2010, Dr. Purkayastha observed a worsening of Mortenson's condition, i.e., increased swelling and discomfort. Tr. 254. Mortenson was advised to stay home and keep his leg elevated. Id.  On August 5, 2010, Dr. Purkayastha noted that Mortenson had "some residual swelling and pitting edema" but was "doing fairly well." Tr. 253.  Mortenson was advised to "stay on limited activity and stay in bed and rest at home." Id.  On August 19, 2010, it was

---

[15]Tachycardia is a heart rate above 100 beats per minute.  Dorland's Illustrated Medical Dictionary, 1850 (32nd Ed. 2012).

reported that Mortenson was "undergoing [a] considerable amount of stress at home because of child support" and a scheduled "appearance in court." Tr. 303. Dr. Purkayastha observed "some residual swelling" in Mortenson's left lower extremity but otherwise Mortenson was "doing fairly well." Id. Mortenson was advised to continue taking Coumadin. Id.

Mortenson had several appointments with Dr. Purkayastha in September, 2010. Tr. 249-251, and 296-297. On September 2nd it was observed that Mortenson had residual swelling and some tenderness in the left lower ankle. Tr. 250. Mortenson also reported headaches and forgetfulness. Id. Dr. Purkayastha opined that "his forgetfulness and occasional bouts of headache[s] are stress related with family problems as well [as] there could be some alcoholic effect due to alcoholic degeneration" and that Mortenson may need a neurologic evaluation. Id. Mortenson was advised to continue to take Coumadin. Id. On September 9th Mortenson reported severe headaches and a shooting sensation of pain on the right side of the body including the upper and lower extremities. Tr. 249. The objective physical examination findings reported were normal. Id. Dr. Purkayastha ordered a CT scan of Mortenson's head. Id. The CT scan was performed on September 16th and revealed a normal brain but evidence of chronic sinus disease. Tr. 247. Also, on September 16th Dr. Purkayastha reported that Mortenson "in general seems to be doing fairly well" but "still continues to have intermittent swelling of the legs." Tr. 297. A physical examination revealed "some residual swelling over the left ankle[.]" Id. Mortenson reported dizzy spells when he changed positions which Dr.

Purkayastha opined "could probably be due to postural hypertension . . . an insignificant problem[.]" Id.

On October 14, 2010, Dr. Purkayastha reported that Mortenson "seems to be progressing fairly well" but that he still had "some swelling" in the left lower extremity and "dizziness at times." Tr. 294.  The objective physical examination findings reported were normal except for "a few [bilateral] inspiratory and expiratory rhonchi."[16] Id.  Dr. Purkayastha advised Mortenson to keep his leg elevated and continue taking Coumadin. Id.  At an appointment on October 29, 2010, Dr. Purkayastha noted a 2 inch difference between the mid portion of Mortenson's left lower leg (17 inches) and right lower leg (15 inches) but noted that the swelling "overall" had subsided. Tr. 292.  Dr. Purkayastha reported that Mortenson was still having dizziness "likely related to his postural hypertension." Id.  Mortenson was advised "to use stockings" and "continue on the Coumadin." Id.

On December 3, 2010, Dr. Purkayastha reported that Mortenson was "doing fairly well" and that the swelling of his lower leg had improved, Tr. 290.  Mortenson reported suffering from occasional dizziness. Id.  Mortenson was advised to continue taking his medications and "stay off the leg as much as possible." Id.

On April 8, 2011, Mortenson had an appointment with Dr. Purkayastha at which Mortenson complained of soreness in his left leg.  Tr. 289.  It was noted that Mortenson had been in Florida for several months and had not been taking

---

[16]Rhonchi are snorelike noises produced in the throat or bronchial tube due to partial obstruction. Dorland's Illustrated Medical Dictionary, 1630 (32nd Ed. 2012).

Coumadin for 2 months. Id.  Dr. Purkayastha ordered a duplex ultrasound and

doppler evaluation of Mortenson's lower extremities which was performed on April

15, 2011, by Tiffany Bowen, a technologist, and interpreted by Edward Batzel, M.D.

Tr. 321-322.  Dr. Batzel opined that Mortenson suffered from "a superficial

thrombosis in the left greater saphenous vein with gross reflux"[17] and that

Mortenson might benefit from a surgical procedure. Tr. 322.  He further opined that

there was "no evidence of acute deep vein thrombosis in the left leg." Id.

On June 23, 2011, Mortenson had an appointment with Dr. Purkayastha at

which Mortenson complained of "occasional pain and discomfort in the leg and

sometimes even in the thigh muscle occasionally." Tr. 287.   Mortenson reported

that "most of the time pain seems to be going away when he starts walking." Id.

Dr. Purkayastha noted "some minimal leg edema" and "some tenderness present

over the muscle diffusely throughout different areas." Id.  Dr. Purkayastha stated

---

[17]"Venous reflux disease is a condition in which the valves that are supposed
to stop blood from flowing backwards do not function properly and blood becomes
pooled in the legs, causing the veins to expand.  This may lead to varicose veins . . .
[which] are often an indicator of venous reflux disease.  The saphenous vein is most
commonly affected by venous reflux disease. This is the vein that runs from the foot
to the groin." What is Venous Reflux Disease and What Are the Treatments?,
http://ezinearticles.com/?What-is-Venous-Reflux-Disease-
and-What-Are-the- Treatments?&id=4720328 (Last accessed September 3, 2014).

that his findings were suggestive of some degree of myopathy[18] instead of "anything related to his deep vein thrombosis[.]" Id.   Dr. Purkayastha ordered a second duplex ultrasound and doppler evaluation which was performed on July 8, 2011, and revealed "no evidence of acute deep vein thrombosis in the left leg or the right common femoral vein" but "chronic deep vein thrombosis noted in the left popliteal and calf veins." Tr. 320.   Reflux was noted in the left popliteal and posterior tibial veins. Id.

On October 18, 2010, Mortenson was examined by Shashank Bhatt, M.D., on behalf of the Bureau of Disability Determination.  Tr. 280-282.  A physical examination of Mortenson performed by Dr. Bhatt was essentially normal, including normal muscle strength, reflexes and sensation in the upper and lower extremities. Tr. 282.  Dr. Bhatt noted that Mortenson's gait was normal and unassisted. Id.  Dr. Bhatt also completed a range of motion chart which indicates that Mortenson had normal range of motion in his shoulders, knees, hips, cervical spine, lumbar spine and ankles. Tr. 284-285.   Dr. Bhatt reported that Mortenson

---

[18]"The myopathies are neuromuscular disorders in which the primary symptom is muscle weakness due to dysfunction of muscle fiber. Other symptoms of myopathy can include muscle cramps, stiffness, and spasm." NINDS Myopathy Information Page, National Institute of Neurological Disorders and Stroke, http://www.ninds.nih.gov/disorders/myopathy/myopathy.htm (Last accessed September 3, 2014).

weighed 243 pounds and was 5 feet  11 ½ inches in height.[19] Tr. 281.  Mortenson

informed Dr. Bhatt that he smoked 1 pack of cigarettes per day and that he was a

"12-pack-per-week drinker." Id.

On October 26, 2010, Frank M. Mrykalo, Ed.D, a psychologist, reviewed

Mortenson's medical records on behalf of the Bureau of Disability Determination

and concluded that Mortenson did not suffer from a medically determinable

psychological impairment.   However, Dr. Mrykalo did not review Mortenson's

school records which revealed that Mortenson suffered from a learning disability.

The record does not contain a statement of Mortenson's work-related

physical functional abilities ( i.e, a statement of his ability to sit, stand, walk, carry,

lift, push and pull) from a creating or examining physician.

## IV.   Discussion

The administrative law judge at step one of the sequential evaluation process

found that Mortenson did not engage in substantial gainful work activity since

May 14, 2010, the alleged disability onset date. Tr. 16.

At step two of the sequential evaluation process, the administrative law judge

found that Mortenson had the following severe impairments: "a history of mild

---

[19]An individual of such height and weight has a body mass index of 33.4 and
is considered obese. Center for Disease Control and Prevention. Healthy Weight,
Adult BMI Calculator, http://www.cdc.gov/healthyweight/assessing/bmi/
adult_bmi/english_bmi_calculator/bmi_calculator.html (Last accessed September 3,
2014).  Adults with a BMI of 30 or higher are considered obese. Assessing Your
Weight, Center for Disease Control and Prevention, http://www.cdc.gov/
healthyweight/assessing/index.html (Last accessed September 3, 2014).

mental retardation; obesity; and left lower extremity deep venous thrombosis ("DVT")[.]" Id.  The administrative law judge stated that the "impairments cause more than a minimal effect on the claimant's ability to perform basic work activities." Tr. 17.  The administrative law judge also stated that Mortenson was never diagnosed with anxiety or depression and found that those conditions were not medically determinable; Mortenson's headaches were a nonsevere impairment; and that any respiratory problems, including chronic obstruction pulmonary disease, were nonsevere impairments.

At step three of the sequential evaluation process the administrative law judge found that Mortenson did not  have an impairment or combination of impairments that met or equaled the requirements of a listed impairment. Tr. 17-18.  The administrative law judge in assessing Mortenson's mental health impairments found that he had moderate difficulties with concentrations, persistence and pace but that he still could perform simple work.  Tr. 18.   However, the administrative law judge rejected the opinion of Dr. Mrykalo that Mortenson had no medically determinable mental impairment. Tr. 21.  Instead the administrative law judge found that Dr. Mrykalo ignored Mortenson's school records.  Based upon Mortenson's IQ scores (taken when Mortenson was about 9 years old) the administrative law judge limited Mortenson to unskilled work. Id.

At step four of the sequential evaluation process, the administrative law judge found that Mortenson could not perform his prior relevant work as a stone cutter, tree cutter, glass repairer and construction worker but that he could perform the

full-range of unskilled, sedentary work. Tr. 19 and 22.  Consequently, as mentioned

earlier in this memorandum,  the administrative law judge made findings of fact

which corresponded with all of the criteria of Rule 201.24 of the Medical-Vocational

Guidelines and concluded that based on Mortenson's residual functional capacity,

age, his education and his past work that  he was not disabled because he could

perform a significant number of sedentary jobs in the national economy.

The administrative record in this case is 338 pages in length, primarily

consisting of medical and vocational records and we have thoroughly reviewed that

record.  Mortenson argues that  the administrative law judge erred (1) when she

contravened Social Security regulations and policy regarding holding a hearing and

only rendering a decision after providing Mortenson with a full and fair opportunity

to appear and testify, and (2) by failing to take into account evidence of his

intellectual disability at either step three or step five of the sequential evaluation

process.  The court finds that Mortenson's first argument has substantial merit.[20]

Mortenson did not appear at the administrative hearing in Wilkes-Barre

scheduled for September 27, 2011.  Substantially in advance of that hearing

---

[20]The court will not address the second argument but on remand the
Commissioner is not prohibited from revisiting the issue. It does appear that the
administrative law judge's utilization of the Medical-Vocational Guidelines instead
of calling a vocational expert to testify was erroneous.  The evidence suggests that
Mortenson had nonexertional impairments or limitations, including the need for a
sit/stand option.  The Commissioner is not prohibited from revisiting the issue of
Mortenson's nonexertional limitations on remand.  The record does not contain a
psychological evaluation indicating that Mortenson has the mental ability to engage
in the full-range of unskilled, sedentary work.

Mortenson filed a document entitled "Statement of Claimant or Other Person" in which he certified as follows: "I would like my hearing to be held at the Wilkes-Barre [Office of Disability Adjudication and Review]. This is more convenient for myself and my representative. I understand I can't be reimbursed for mileage." Tr. 70. At the hearing Mortenson's non-attorney representative appeared but Mortenson did not appear. Tr. 29-31. The record establishes that the administrative law judge was aware that the notice of the ~~the~~ hearing sent to Mortenson informing him of the date and time of the hearing had been sent to an incorrect address; the administrative law judge even informed the non-attorney representative of Mortenson's current address which she had received from the U.S. Postal Service. Tr. 31 and 76. Notably, although Mortenson's new address was received by the hearing office on September 1, 2011, a reminder notice was not sent out to Mortenson until September 13, 2011, only 14 days before the hearing date. Tr. 76 and 77-88. The record does, however, reveal that the U.S. Postal Service forwarded the initial notice of the September 27, 2011, hearing to Mortenson's new address on August 25, 2011. Tr. 76.

The Social Security regulations provide that "[a]ny party to a hearing has a right to appear before the administrative law judge . . . ." 20 C.F.R. § 404.950(a). The regulations further require that after a time and place for a hearing has been set, notice of the hearing will be mailed to the claimant at his or her last known address unless the claimant in writing has indicated that he does not wish to receive such notice. 20 C.F.R § 404.938(a). The notice also has to be mailed or served 20 days

before the hearing. Id.  This regulation also provides for an acknowledgment of the notice by stating as follows: "The notice of hearing will ask you to return a form to let us know that you received the notice.  If you or your representative do not acknowledge receipt of the notice of hearing, and amended notice will be sent to you by certified mail." Id.

The Hearings, Appeal and Litigation Law Manual of the Social Security Administration (HALLEX) provides that, if a claimant fails to appear at the hearing, the administrative law judge - prior to rendering a decision - shall issue a Notice to Show Cause on the claimant asking the claimant why he or she failed to appear, and why a supplemental hearing should be held. HALLEX I-2-4-25(D).  It is undisputed that the administrative law judge in this case did not issue and mail such a Notice to Show Cause to Mortenson at his last known address. The administrative law judge was aware that Mortenson was intellectually impaired and did not take any action after the hearing to contact Mortenson.   Instead she placed the burden of notifying Mortenson entirely on the non-attorney representative to locate and contact Mortenson.  There is no evidence in the record that the non-attorney representative contacted Mortenson or that Mortenson knowingly failed to respond to a Notice to Show Cause.  In fact it appears from the record that Mortenson was not aware of the hearing date or that a hearing had been held because he reported a change of address to the Social Security Office in Binghamton, New York, on December 8, 2011,  not to the Social Security hearing office in Wilkes-Barre,  and the address

which he reported was different from the one reported to the non-attorney representative at the hearing on September 27, 2011.[21]  Tr. 210 and 215-216.

Under the circumstances of this case, in which the administrative law judge is apprised that the claimant has certain intellectual limitations, the court finds that the administrative law judge's failure to comply strictly with HALLEX provisions relating to issuance of a Notice to Show Cause deprived Mortenson of his right to appear and testify at an administrative hearing.  Consequently, the case will be remanded for a new hearing.

An appropriate order will be entered.


　　　　　　　　　　　　 /S/ CHRISTOPHER C. CONNER
　　　　　　　　　　　　Christopher C. Conner, Chief Judge
　　　　　　　　　　　　United States District Court
　　　　　　　　　　　　Middle District of Pennsylvania


Dated:　　　September 15, 2014

---

[21]Moreover, our review of the administrative record did not reveal a copy of the original hearing notice which was sent to Mortenson scheduling a hearing for September 27, 2001.  The only notice in the record is entitled "Notice of Hearing - Important Reminder" dated September 13, 2011. Tr. 77-81.  This notice advised Mortenson to call the Social Security hearing office in Wilkes-Barre if he had not yet returned the Acknowledgment Form. Tr. 77.